UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

University Physician Group,      Case No. 18-55138-MAR
               Chapter 11
    Debtor.        Hon. Mark A. Randon
_____/

## DEBTOR'S COMBINED DISCLOSURE STATEMENT AND
## PLAN OF REORGANIZATION

**IMPORTANT! THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN OF REORGANIZATION. PLEASE READ THIS DOCUMENT WITH CARE.**

Prepared By:
STEINBERG SHAPIRO & CLARK   Robert N. Bassel  (P 48420)
Mark H. Shapiro (P43134)     Co-counsel for Debtor
Attorney for Debtor       P.O. Box T
25925 Telegraph Road, Suite 203   Clinton, MI 49236
Southfield, MI 48033      (248) 677-1234
248-352-4700         bbassel@gmail.com
shapiro@steinbergshapiro.com

1

## PLAN OF REORGANIZATION

Debtor proposes the following Combined Disclosure Statement and Plan of Reorganization (the "Plan") pursuant to §§1121 and 1123 of the Bankruptcy Code.

## ARTICLE I

## DEFINITIONS

As used in this Plan, the following terms shall have the meanings specified below, unless the context requires otherwise:

1.1 **"Administrative Claim"** means costs and expenses of administration of this Chapter 11 case allowed under §§503(b) and 507(a) of the Bankruptcy Code and the fees of the United States Trustee under 28 U.S.C. §1430(a)(6).

1.2 **"Administrative Creditor"** shall mean any Creditor who asserts an Administrative Claim.

1.3 **"Allowed Claim"** or "**Allowed Interest**" means a Claim against or Interest in the Debtor to the extent that:

    A.    A Proof of Claim or Interest was:

        1.  Timely filed;

        2.  Deemed filed pursuant to §1111(a) of the Code;

        3.  Deemed an Allowed Claim in the Plan; or

        4.  Filed late with leave of the Bankruptcy Court after notice and an opportunity for hearing; and

B.    The Claim is not a Contested Claim or a Contested Interest, or

C.    The Claim is allowed (and only to the extent allowed) by a Final Order of the Bankruptcy Court or deemed an Allowed Claim in this Plan.

1.4    **"Avoidance Actions"** means all claims granted the Debtor-in-possession or a trustee under §§ 544-553 of the Code.

1.5.    **"Ballot"** shall mean the official Bankruptcy Form or a document prepared to substantially conform to same being sent to all creditors and parties-in-interest entitled to vote for or against the Plan.

1.6    **"Bankruptcy Code"** or **"Code"** means the Bankruptcy Reform Act of 1978, as amended (11 U.S.C. §§101, <u>et</u> <u>seq</u>.), also known as the United States Bankruptcy Code.

1.7    **"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, and any court having jurisdiction over any appeals.

1.8    **"Bankruptcy Rules"** or **"Rules"** means the Federal Rules of Bankruptcy Procedure, and any amendments thereto. To the extent applicable, Bankruptcy Rules also refers to the Local Rules of the U.S. District Court for the Eastern District of Michigan, as amended and the Local Bankruptcy Rules for the Eastern District of Michigan, as amended.

3

1.9     **"Business Day"** means any day, other than a Saturday, Sunday or "Legal Holiday," as that term is defined in Bankruptcy Rule 9006(a).

1.10    **"Case"** means the relevant above-captioned case currently pending before the Bankruptcy Court.

1.11    **"Claim"** means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, Contested, disputed, undisputed, legal, equitable, secured or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.12    **"Class"** means a class of holders of Claims or Interests described in Article III of this Plan.

1.13    **"Committee"** means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Case.

1.135   **"Confirmation Date"** means the date upon which the Bankruptcy Court shall enter the Confirmation Order in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.14    **"Confirmation Hearing"** means the hearing conducted by the Bankruptcy Court to consider the confirmation of the Plan filed by Debtor.

4

1.15 **"Confirmation Order"** means the order entered confirming this Plan by the Bankruptcy Court pursuant to §1129 of the Code.

1.16 **"Contested Claim"** means any Claim that is not deemed an Allowed Claim in the Plan and as to which the Debtor or any other party in interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order. For clarity, unless any Claim is an Allowed Claim pursuant to Section 1.3 of the Plan, such Claim shall not be deemed an Allowed Claim and is subject to objection pursuant to the other terms of this Plan.

1.17 **"Creditor"** means any holder of a Claim against the Debtor.

1.18 **"Debtor"** means University Physician Group ("UPG").

1.19 **"D&O Claims"** means any claims that may be brought against current or former officers and directors of the Debtor.

1.20 **"Effective Date"** means the later of June 15, 2019 or the 60th calendar day after the Confirmation Order becomes a Final Order. Notwithstanding the foregoing, the "Effective Date" may be extended or shortened by the agreement of WSU and Debtor to the extent required under and pursuant to the Restructuring Support Agreement.

1.21  "**Exhibit**" means all exhibits and documents included in the Plan and Plan Supplement, which are incorporated into and are a part of the Plan as if set forth in full in the Plan.

1.22  **"FMRE"** means the Fund for Medical Research and Education, a Michigan nonprofit corporation.

1.23  **"Final Order"** means an Order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken; or (ii) any timely appeal has been finally determined or dismissed.

1.24  **"Impaired"** means a Claim treated under this Plan, unless the Plan:

(a)  leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; or

(b)  notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default—

(1)  cures any such default (other than defaults relating to (i) any penalty interest rate or provision arising from a non-monetary default by the Debtor; (ii) the solvency or financial condition of the Debtor or (iii) the commencement of this Case) that occurred before or after the commencement of the Case;

(2)  reinstates the maturity of such Claim or Interest as such maturity existed before such default;

6

(3)     compensates the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

(4)     does not otherwise alter the legal, equitable or contractual rights to which such Claim or Interest entitles its holder.

1.25 **"Insider"** shall mean a current or former director, shareholder, officer, partner, person in control, relative of a director, officer, partner or person in control of the Debtor or a corporation or entity in which an Insider (as defined above) of the Debtor is an Insider.

1.26 "**Interest Holder"** means the holders of the Interests of the Debtor as of the Petition Date.

1.27 **"Interest"** means an equity interest in the Debtor as defined in §101 of the Code. Because this is a not for profit entity, there is no equity owner for UPG in an economic sense.

1.28 **"Interest Rate"** means, unless specified, (a) with respect to Claims entitled to interest under §506 of the Bankruptcy Code and this Plan and having an applicable contractual rate of interest, the lowest rate of interest provided in such contract, without regard to any default by Debtor, (b) with respect to all other Claims entitled to interest under the Bankruptcy Code and this Plan, 5% per annum, or (c) with

7

respect to (a) or (b) such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

1.29    **"IRS"** means the Internal Revenue Service, an agency of the United States of America, and its representatives, affiliated agencies and assignees.

1.30    **"Lien"** means a charge against, or an interest in property to secure payment of a debt or performance of an obligation.

1.31    **"Petition Date"** means the date Debtor filed the Voluntary Petition commencing the Case under Chapter 11 of the Bankruptcy Code, being November 7, 2018.

1.32    **"Plan"** means this Plan of Reorganization, as it may be altered, amended or modified from time to time.

1.33    **"Plan Supplement"** means the compilation of documents and forms of documents, schedules, and Exhibits to the Plan, to be filed by the Debtor at various times no later than 14 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement, and shall be incorporated into and are a part of the Plan as if set forth in full in the Plan. The Plan Supplement shall include, without limitation, the RSA. The Debtor shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

8

1.34 **"Priority Claim"** means a Claim under or entitled to priority under Code §507(a) of the Code.

1.35 **"Priority Creditor"** means a Creditor who asserts a Priority Claim.

1.36 **"Professional Fees"** means the fees and reimbursement for disbursements owed to attorneys, accountants, or other professionals whose employment has been approved by the Bankruptcy Court.

1.37 **"Reorganized Debtor"** shall mean the Debtor, on and after the Effective Date.

1.38 **"RSA"** means that certain Restructuring Support Agreement among WSU and the Debtor, to be included in the Plan Supplement as an Exhibit.

1.39 **"Secured Claim"** means a Claim secured by a Lien on property in which the estate has an interest but only to the extent of the value of the Creditor's interest in the estate's interest in the property as of the Petition Date.

1.40 **"State of Michigan"** means the Michigan Department of Treasury, Michigan Unemployment Agency or any other governmental agencies of the State of Michigan.

1.41 **"WSU"** means Wayne State University, a Michigan constitutional body corporate of the State of Michigan.

1.42 **"WSU Financial Accommodations"** has the meaning set forth in Section 4.1 of the Plan.

9

1.43    **"Unsecured Claim"** means a Claim that is neither a Secured Claim, an Administrative Claim, nor a Priority Claim.

1.44    **"Unsecured Creditor"** shall mean any Creditor that holds an Unsecured Claim.

## ARTICLE II

### TREATMENT OF CLAIMANTS NOT SUBJECT TO CLASSIFICATION OR OTHERWISE NOT REQUIRED TO VOTE FOR OR AGAINST THE PLAN

For the purposes of approval and implementation of this Plan and the resultant reorganization of the Debtor, Administrative Creditors and Priority Creditors shall be paid on account of their respective Administrative and Priority Claims in accordance with the provisions set forth below. Certain types of claims are not placed into voting classes; instead they are grouped or unclassified. They are not considered Impaired; they do not vote on the Plan; and they are entitled to specific treatment provided for them in the Bankruptcy Code. As such, Debtor has not placed the following Claims in a class. The treatment of these Claims is provided below:

2.1    **GROUP I**. The Claims of Group I shall consist of all Administrative Claims. The Allowed Claims of this Group shall be paid the full amount of their Claims on such date as may be mutually agreed upon between Debtor and the particular claimant, or, if no such date is agreed upon, the latest of (i) the Effective Date, (ii) the date by which payment would be due in the ordinary course of business between Debtor and such Administrative Creditor, or (iii) the date on which the Bankruptcy Court

10

enters its order, if necessary, approving Debtor's payment of such expenses. In addition to any ordinary course administrative expenses, it is estimated that the only entities in this class shall be the following, and the estimated amounts of their combined Administrative Claims is anticipated to be no more than $2,000,000: Steinberg Shapiro & Clark, Debtor's counsel; Robert Bassel, co-counsel for Debtor; AlixPartners, LLP, financial professionals for Debtor; O'Keefe & Associates Consulting, L.L.C., financial professionals for the Unsecured Creditors Committee, Pepper Hamilton LLP, counsel for the Unsecured Creditors Committee.

2.2 **GROUP II**. The Claims of Group II shall consist of all Priority Creditors entitled to receive priority for their Allowed Claim under §507(a)(8) of the Bankruptcy Code. Any Allowed Priority Claims shall be paid in equal monthly payments over 96 months from the Effective Date at 3.5% interest per annum, commencing on the Effective Date.

2.3 **GROUP III**. The Claims of Group III shall consist of all other Priority Creditors entitled to receive priority for their Allowed Claim under §507(a) of the Bankruptcy Code other than §507(a)(8). Two Priority proofs of claim have been filed for a total amount of $18,437.67 by the following Creditors: Dell Marketing, which has filed a "priority" claim in the amount of $2,187.67; and, Jeffery Kohlitz, who has filed a priority claim in the amount of $16,250.00 on the basis of 11 U.S.C. §507(a)(4) as to wages and benefits earned by an individual within the 180 days prior to the

11

Petition Date (exceeding the statutory maximum amount). Dell has also asserted that it is entitled to reclamation rights, and Debtor has thus separately classified Dell because of its unique rights *vis a vis* other Claims. Any Allowed Priority Claims shall be paid in equal monthly payments over 96 months from the Effective Date at 3.5% interest per annum. Mr. Kohlitz shall be treated as having asserted a Group III Priority Claim.

## ARTICLE III

### SPECIFICATION OF TREATMENT OF CLASSES OF CLAIMS OR INTERESTS NOT IMPAIRED UNDER PLAN AND THOSE IMPAIRED UNDER THE PLAN

The Plan divides Claims and Interests into classes and treats them as follows, all of which are impaired unless noted.

| Class | Claimant | Treatment for Claims in this class |
|---|---|---|
| Class 1 | Everbank Commercial Finance (Nasolaryngoscope) | The claimant in this Class, with respect to a security interest in a Nasolaryngoscope in the amount of $15,108.93, which is a Secured Claim, shall be paid over 24 monthly installments of $629.53 per month with no interest. The value of this collateral is approximately $15,000. Claimant in this Class shall its Lien until the Claim in this Class are paid in full.<br><br>Deemed Allowed.<br><br>Payments shall start on the Effective Date.<br><br>This Class is Impaired. |
| Class 2 | Everbank Commercial Finance (Pentax/Kayp | The claimant in this class, with respect to a security interest in a Pentax/Kaypentax nasolaryngoscope in the amount of $35,850.78, which is a secured claim, shall be paid over 24 monthly installments of |

| | | |
|---|---|---|
| | entax nasolaryngos cope) | $1,493.78 per month with no interest. The value of this collateral is approximately $35,000. Claimant in this class shall retain its Lien until the claim in this class is paid in full.<br><br>Deemed Allowed.<br><br>Payments shall start on the Effective Date.<br><br>This Class is Impaired. |
| Class 3 | Chemical Bank | The claimant in this class, with respect to the security interest in the Portable X-Ray machine in the amount of $3,921.76 which is a secured claim, shall be paid over 39 monthly installments of $100 per month with no interest, and a final payment in the amount of $21.76 on the 40th month. The value of this collateral is approximately $4,000. Claimant in this class shall retain its Lien until the claim in this class is paid in full.<br><br>Deemed Allowed.<br><br>Payments shall start on the Effective Date.<br><br>This Class is Impaired. |
| Class 4 | Dell Marketing, L.P. | This Class is made of Dell's reclamation claim in the amount of $2,187.67, which shall be paid in full over 12 monthly payments without interest in the amount of $182.30, with respect to electronics sold to UPG. Dell shall retain its rights as to the electronics that make up its reclamation claim until this claim is paid in full. The rest of its total claim of approximately $2,384.29 less $2,187.67 shall be treated as a general unsecured claim in the amount of $196.62.<br><br>Deemed Allowed.<br><br>Payments shall start on the Effective Date.<br><br>This Class is Impaired. |

13

| | | |
|---|---|---|
| Class 5 | McKesson Specialty Care Distribution, LLC | This Class is made of McKesson Specialty Care Distribution, LLC's reclamation claim in the amount of $296,994.75 which shall be paid on the Effective Date, without interest, with respect to various goods sold to UPG. McKesson Medical shall retain its rights as to the goods that make up their reclamation claim until this claim is paid in full.<br><br>Deemed Allowed.<br><br>This class is Impaired. |
| Class 6 | McKesson Medical-Surgical, Inc. | This Class is made of McKesson Medical-Surgical, Inc.'s reclamation claim in the amount of $45,185.34, which is being discounted to $43,799.25, and which shall be paid on the Effective Date, without interest, with respect to various goods sold to UPG. McKesson Medical shall retain its rights as to the goods that make up its reclamation claim until this claim is paid in full.<br><br>Deemed Allowed.<br><br>This Class is Impaired. |
| Class 7 | Unsecured Claims | This Class is made up of all Unsecured Claims. Allowed Unsecured Claims, excluding the Allowed Unsecured Claims of WSU and FMRE (which are deemed Allowed and subordinated pursuant to the other terms of the Plan) shall be paid *pro rata* the lesser of $8,056,253 or 83.2%[1] (the "Pro Rata Amount") without interest in equal annual installments ("Installment Payments") commencing on the Effective |

[1] The present value of these payments (assuming the maximum of $8,056,253 is paid) using a 5.5% discount rate over the 4 year period is $7,258,926 or 75% of the current estimated Unsecured Claim pool (excluding the Claims of WSU and FMRE) of $9,682,996.

14

| | | Date and continuing on the next 4 anniversary dates of the Effective Date in full satisfaction of their Claims.

An updated spreadsheet indicating which creditors hold Allowed Claims in this class and the amount of their claims shall be filed prior to the initial distributions to this Class, and further updated and retained by Debtor's counsel during the claims allowance process and available upon request.

Pursuant to the WSU Financial Accommodations: WSU shall have an Allowed Unsecured Claim in the amount of $6,632,753.42, plus any lease rejections claims, if applicable; and, FMRE shall have an Allowed Unsecured Claim in the amount of $1,349,307.43. The Allowed Unsecured Claims of WSU and FMRE are subordinated to all Allowed Unsecured Claims for purposes of Plan distribution only, and not for any other purposes. On account of their Allowed Unsecured Claims, WSU and FMRE shall be paid *only* the Pro Rata Amount of their Allowed Claims pursuant to the RSA (defined herein).

This Class is Impaired. |
|---|---|---|

| | | |
|---|---|---|
| Class 8 | Hewlett-Packard Financial Services Company | The claimant in this class holds a secured claim in the amount of $214,698.73 based upon a security interest in certain electronics sold to the Debtor. This claim shall be paid over 55 monthly installments of $3,833.90 per month with no interest. The value of this collateral is approximately $214,698.73.<br><br>Claimants in this class shall retain their lien until the claims in this class are paid in full.<br><br>Deemed Allowed.<br><br>Payments shall start on the Effective Date.<br><br>This class is impaired. |
| Class 9 | MEPP Program Claims | WSU is party to a contract with the State of Michigan in connection with the Medicaid Enhanced Payment Program (the "MEPP Program"). This Court has already ruled that the funds related to the MEPP Program are not property of the Debtor's estate (*see Supplement to Final Order Granting Debtor's First Day Motion for Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Ordinary Course Changes to Cash Management System, and for Other Related Relief* (Docket No. 260) (the "Supplemental Order"). Moreover, the relationship of the Debtor and MEPP Program Claimants is governed by that certain Affiliation Agreement dated December 8, 2014, which expressly states that the Debtor shall have no liability to MEPP Program Claimants with respect to the receipt of MEPP Funds. MEPP Funds are the funds transferred by UPG to WSU pursuant to the Supplemental Order<br><br>This Class is made of claims asserted against the Debtor relating to the MEPP Program as follows: |

16

| Claimants | Claim No. | Amount of Claim |
|---|---|---|
| Ark Cardiovascular & Arrhythmia Center | 67 | $876,572.00 |
| Hamid Sattar, M.D., P.C. | 69 | $139,588.00 |
| Heart and Vascular Consultants, PLLC | 56 | Unknown |
| NorthStar Anesthesia of Michigan PLLC | 64 | $2,428,675.08 |
| Rehabilitation Physicians, P.C. | 68 | $51,568.71 |
| University Pediatricians | | $60,497,849.00 |
| Medical Center Emergency Services | | $20,762,639.80 |

The Debtor has objected or will object to the MEPP Program Claims. Without limitation, the Claims are not claims against the Debtor, but rather are claims relating to the MEPP Program and funds allegedly owed pursuant to the MEPP Program, which funds are not property of the Debtor's estate.

The MEPP Program Creditors shall not receive any distribution on account of their Claims. For clarity, it is contemplated that a motion to estimate the claims asserted by the claimants in this Class shall be filed, as well as objections to their proofs of claim.

This Class is Impaired.

| Class 10 | Class of Interests | As a non-profit entity, Debtor has no Interest Holders in an economic sense. To the extent there is an Interest Holder, it shall not receive any distribution |

| | | on account of its Interest in Debtor, but will retain its Interest in Debtor and all rights relating to its Interest. This Class is not Impaired. |
|---|---|---|

## ARTICLE IV
## EXECUTION AND IMPLEMENTATION OF THE PLAN
## INCLUDING WSU FINANCIAL ACCOMMODATIONS

4.1 **Funding of the Plan:** With the assistance of financial and other accommodations being provided by Wayne State University (defined herein as the "WSU Financial Accommodations"), Debtor reasonably believes that its future operations will generate sufficient funds to satisfy its obligations under the Plan. The following is a general summary of the primary WSU Financial Accommodations, subject in all respects to the terms of the RSA:

| Loans | Term Loan: Non-revolving advances equal to the amount of each Installment Payment (non-discretionary). |
|---|---|
| | Revolving Loan: $7,500,000 composed of (i) $5,000,000 (discretionary) for working capital needs, and (ii) $2,500,000 (non-discretionary) eligible to be drawn on Effective Date. |
| Term | Term Loan: 15-year term, but payable on demand, however, if demand is made prior to the making of all Term Loan advances, the obligation to make the remaining Term Loan advances to be used solely for the purpose of making the remaining Installment Payments continues to be effective. |
| | Revolving Loan: Payable on demand, but 2-year renewable terms if no uncured defaults exist or by mutual agreement, for up to a total of 15 years. |

18

| | |
|---|---|
| Security/<br>Cross-<br>Collateral/<br>Cross-<br>Default | First priority and exclusive security interest in all assets except existing purchase money secured loans/leases. Secured obligations include all term and revolving loan advances, Dean's Tax deferrals and allowed WSU and FMRE claims (100% of any Administrative Claims and Pro Rata Amount of Allowed Unsecured Claims).<br><br>Loans cross-collateralized and cross-defaulted. |
| Interest Rate | Term Loan: 4.00% (fixed)<br><br>Revolving Loans: 3.00% (fixed) / 0.00% on certain advances. |
| Payments | Term Loan: Interest only payable quarterly (years 1 - 3); principal and interest payable quarterly based on 15-year amortization (years 4 - 15); balance due on 15th anniversary date; additional annual payments equal to 20% of Excess Cash Flow (years 4 - 15)<br><br>Revolving Loan: Interest only payable quarterly; unpaid balance due on 15th anniversary date.<br><br>Dean's Tax Deferrals: Repayable from Excess Cash Flow commencing in Year 8 without interest as set forth below; unpaid balance due at end of Year 23.<br><br>The Pro Rata Amount of the WSU and FMRE Allowed Unsecured Claims shall be repaid in equal annual payments commencing in Year 8 through Year 23: each payment equal to original balance divided by 15 x 50%; each $1 in payment reduces balance by $2, including a payoff as part of a refinancing and complete payoff of the Loans; unpaid balance due at end of year 23. |

To the extent that additional funds are necessary, other third parties may provide such funds to the Reorganized Debtor. Other sources of cash may be explored and utilized by the Reorganized Debtor to the extent that such cash infusions are necessary to meet the obligations of the Plan. Debtor may also sell all of its assets or a

portion of its assets to fund its obligations under the plan, subject to the terms of this Plan and any incorporated agreements.

4.2 **Refinancing/Financing.** If necessary, the Reorganized Debtor may, in its sole discretion, seek to obtain additional (re)financing from either a lending institution or from other sources in an effort to satisfy the obligations described in this Plan. In the event that the Reorganized Debtor obtains such (re)financing, it shall neither obligate the Reorganized Debtor to, or prohibit the Reorganized Debtor from, accelerating any of the payments or obligations set forth in this Plan. There shall be no prepayment penalty regarding plan payments.

4.3 **Avoidance Actions and Releases**.

All Avoidance Actions under chapter 5 of the Bankruptcy Code and all D&O Claims are waived and not retained under the Plan. As consideration for the WSU Financial Accommodations, Debtor and the estate release WSU and FMRE, and all of WSU and FMRE's current and former agents, officers, directors, members of board of governors, employees, attorneys and their respective heirs, successors and assigns, of all claims, whether known or unknown, not including any ordinary course or other due and/or payable obligations pursuant to existing agreements among the parties. All claims, whether known or unknown, against all of Debtor's current and former agents, officers, directors, members of board of governors, employees, attorneys and their respective heirs, successors and assigns, are hereby released.

4.4 **Pre-payment**. The Reorganized Debtor may, but shall not be obligated to, pre-pay any of the claims at any time in its sole, absolute and unfettered discretion. If the Reorganized Debtor elects to pre-pay any obligation, it shall not incur any pre-payment penalty, and any such pre-payment penalty contained in any pre-petition contract, agreement or document shall not apply.

## ARTICLE V

## EFFECT OF CONFIRMATION

5.1 **Discharge:** The confirmation of this Plan shall, and does hereby act to discharge and release the Claims of all Creditors against the Debtor, which shall constitute a full, total and complete settlement with said Creditors and Interest Holders. Confirmation shall also act as a merger and relinquishment of any and all Claims that Creditors have or may have against the Debtor as provided in the treatment of the Creditors in Articles II and III. The Debtor shall receive a discharge as contemplated by 11 U.S.C. §§524 and 1141 upon confirmation of the Plan, such discharge being as broad and all-inclusive as provided by law.

5.2 **Waiver:** Confirmation shall also constitute a waiver by Creditors of any right that they may have, unless supported by a written guarantee or provided by a federal or state statute to a taxing authority, to seek to enforce their Claims against any

third party, whether pursuant to an "alter ego" claim, a claim for "piercing" Debtor's or the Reorganized Debtor's corporate existence, or other similar claim.

5.3     There shall be no prohibition against the Reorganized Debtor, subject to applicable law, merging or being acquired by another person, company, partnership or corporation, or obtaining any financing from any lender willing to provide any financing. The obtaining of financing shall not obligate to, nor prohibit the Reorganized Debtor from, making any earlier payments or distributions.


## ARTICLE VI

## MODIFICATION OF THE PLAN

6.1     Debtor may, from time to time, propose amendments or modifications of this Plan prior to its confirmation, without leave of the Court.   After confirmation, the Debtor may remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Order of Confirmation or otherwise modify the Plan as permitted by law.

## ARTICLE VII

## JURISDICTION OF THE COURT

This Court shall retain jurisdiction in this matter until the Plan has been fully consummated including, but not limited to, the following reasons and purposes:

A.     The classification of the Claim of any Creditor and the re-examination of Claims which have been allowed for purposes of voting, and the

determination of such objections as may be filed to Claims of Creditors. The failure by the Debtor or the Reorganized Debtor to object to, or to examine any Claim for the purposes of voting, shall not be deemed to be a waiver of any right to object to, or reexamine the Claim in whole or in part.

B. The determination of all questions and disputes regarding title to the assets of the estate or Debtor, and all causes of action, controversies, disputes, or conflicts, whether or not subject to action pending as of the Confirmation Date, between the Debtor or the Reorganized Debtor or any other party. This shall include, but not be limited to, any cause of action, avoiding power or right of the Debtor or the Reorganized Debtor to recover assets pursuant to the provisions of the Bankruptcy Code, including, without limitation, Avoidance Actions and claims initiated under §§506 and 510 of the Bankruptcy Code.

C. The correction of any defect, the curing of any omission or the reconciliation of any inconsistency in this Plan or the Order of Confirmation as may be necessary to carry out the purposes and intent of this Plan.

D. The modification of this Plan after confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code and as provided as in the Plan.

E. The enforcement and interpretation of the terms and conditions of this Plan and the entry of orders in support of confirmation of this Plan.

F.      The entry of any order, including injunctions, necessary to enforce the title, rights, and powers of Debtor, the Reorganized Debtor or any party-in-interest, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Court may deem necessary, including without limitation, injunctions to enforce releases or forbearance in favor of guarantors, which would assist the Reorganized Debtor to accomplish its obligations under the Plan.

G.      The review and approval of all professional fee applications for services rendered prior to the Confirmation Date and the review of any professional fees for services rendered in connection with the Plan after the Confirmation Date, to the extent that the Debtor or the Reorganized Debtor dispute all or a portion thereof.

H.      The entry of an order concluding and terminating this Case.

For clarity, this Court does not have nor does it retain jurisdiction regarding the MEPP Program, any MEPP Funds, or any claims arising therefrom, except as set forth in the Supplemental Order.

## ARTICLE VIII

## **TITLE TO PROPERTY**

8.1     Title to the property of the Debtor shall vest in the Reorganized Debtor upon the final payment to be made under the Plan, and the automatic stay shall remain in effect until that time. Notwithstanding this, the Debtor shall be discharged from its

status as Debtor and the affairs and business of the Reorganized Debtor shall thereafter be conducted without Court involvement except as may be governed by the Plan.

## ARTICLE IX

## UNITED STATES TRUSTEE FEES

9.1    The Debtor shall continue to pay to the United States Trustee the appropriate sums required pursuant to 28 U.S.C. §1930(a)(6) until such time as the Chapter 11 Case is closed by the Court.

## ARTICLE X

## EXECUTORY CONTRACTS/UNEXPIRED LEASES

10.1    Unless addressed in Article III of this Plan, the RSA, or otherwise assumed or rejected by a Final Order of the Bankruptcy Court, all executory contracts and unexpired leases of the Debtor either (i) not expressly rejected or (ii) which are not within thirty (30) days after the Effective Date the subject of pending applications to reject and disaffirm, shall be deemed assumed.  At any time prior to and within thirty (30) days after the Effective  Date, the Reorganized Debtor shall be allowed to file a Notice of Rejection of Lease/Executory Contract (the "Notice") with the Bankruptcy Court and the lease/executory contract which is the subject thereof shall thereupon be rejected.  In connection with any lease/executory contracts that are assumed, absent a provision to the contrary, the Debtor shall be permitted to pay Claims arising from leases/executory contracts that existed as of the Petition Date in 60 equal, monthly

25

installments beginning one month after the Effective Date. Debtor does not believe that any cure costs exist that would be required prior to assumption of any lease/executory contract.

10.2    Any Creditor who has a Claim as a result of such rejection shall have thirty (30) days after receipt of the Notice to file a Proof of Claim, failing which such Claim shall be disallowed in its entirety. The Notice shall contain a provision informing any potential creditor of this requirement and shall be served on such potential creditor(s). A summary of prepetition leases is set forth below in the Disclosure Statement portion of the Plan.

10.3    A motion to extend the time to assume or reject Debtor's unexpired leases has been filed [Docket 283], and the motion and the relief requested are incorporated by reference into the Plan. A bridge Order extending the time to assume or reject was entered by the Court [Docket 285], which provided that "[t]he deadline for the Debtor to assume or reject the Unexpired Leases is hereby extended through and including the date of entry of an Order relative to Debtor's Motion to Extend Deadline for Assumption/Rejection". The motion to extend requests, inter alia, the following relief, "[t]he Debtor shall have through the earlier of: June 5, 2019; or the date of confirmation of a Chapter 11 plan in this case, within which to assume, assume and assign, or reject unexpired nonresidential real property leases". An order granting the relief requested was entered on March 15, 2019 [Docket 325].

26

10.4 **Assumption of Debtor's Medicare Executory Contracts**

1.  The Debtor has executory contracts with Medicare, which consist of Enrollment Agreements and a Participating Supplier Agreement (collectively, the "Medicare Executory Contracts").

2.  *Assumption*.  Notwithstanding anything to the contrary in Debtor's Disclosure Statement or Plan of Reorganization, the Debtor shall assume and cure the defaults on each of the Medicare Executory Contracts with the Centers for Medicare and Medicaid Services ("CMS").

3.  *Assumption Date.*  Provided that all issues regarding Debtor's cure of any defaults under its Medicare Executory Contracts are addressed to the satisfaction of Centers for Medicare & Medicaid Services ("CMS") on or before the date that the Bankruptcy Court confirms the Debtor's Plan ("Confirmation Date"), the Debtor shall assume the Medicare Executory Contracts upon the Confirmation Date.

4.  *Cure Prior to Assumption of the Medicare Executory Contracts*

    a.  <u>Compliance with Program Requirements</u>.  Debtor will comply with all applicable Medicare program requirements as set forth in Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare Act"), and all relevant regulations, rules, and CMS manual provisions.

    b.  <u>Cure of Defaults in General.</u>  Apart from the provision for identified monetary defaults below, notwithstanding anything to the contrary in the Plan and any exhibits thereto (now or as amended) or in the Confirmation Order, the term "cure," for purposes of Debtor's assumption of the Medicare Executory Contracts, means being governed by, and subject to, the terms and conditions of its Medicare Executory Contracts and the incorporated statutes, regulations, policies and procedures, and to remain liable for any debt to CMS as if the bankruptcy case had not occurred.

    c.  <u>Cure of Specific Monetary Defaults Identified Prior to Confirmation.</u>  Except as otherwise provided by mutual agreement between CMS and Debtor in a settlement stipulation, agreement, compromise and/or extended liquidation schedule

27

that Debtor and CMS may (but are not obligated to) enter into prior to the Confirmation Date, Debtor must cure all monetary defaults due under the Medicare Executory Contracts that CMS has identified to the Debtor in writing before the Confirmation Date. CMS's right to cure of such identified monetary defaults per the Plan will be in addition to and without limitation upon its right to recoup Medicare debts or its other rights and authorities under the Medicare Act. If Debtor and/or CMS propose a separate agreement, compromise and/or extended liquidation schedule, the process for consideration of any such proposal will remain governed by the Medicare Act, as well as all relevant regulations, rules, and CMS manual provisions, as if Debtor were not in bankruptcy.

5. *Post-Confirmation Proceedings.* Notwithstanding any other section of the Plan and any exhibits thereto (now or as amended) or the Confirmation Order, all agreements, issues, and disputes arising under the Medicare Act, 42 U.S.C. § 1395, *et seq.*, shall be governed exclusively by Medicare statutes, regulations, policies and procedures, without regard to the Bankruptcy Code or Bankruptcy Rules. For example, if CMS determines that there are any Medicare overpayments or underpayments – whether arising from medical services furnished pre-petition, post-petition, after the effective date of confirmation – CMS may adjust ongoing payments to the reorganizing Debtor to otherwise recover any overpayments or pay out any underpayments in accordance with the Medicare statute, regulations, policies and procedures.

6. *CMS Claims Unimpaired.* Without limiting CMS's right to payment of specific identified monetary defaults under the Medicare Executory Contracts that must be cured prior to assumption as set forth above, all of CMS's claims shall be unimpaired under 11 U.S.C. § 1124 and shall pass through the bankruptcy case unaffected by the Plan and/or any other court order in the Chapter 11 Case. Any amounts due on such claims shall be collected in the ordinary course of business, and the United States, on behalf of CMS, shall not be required to file any separate claim in the bankruptcy to collect any amounts due to CMS under the Medicare program, whether via proof of claim, claim for cure, or administrative claim. Nothing contained in the Plan and any exhibits thereto (now or as amended) shall release or operate to enjoin any claim of the United States, on behalf of CMS, against the Debtor, the Purchaser, or any non-debtor.

28

7.   **The Medicare Act's Jurisdictional Limitations.**  Notwithstanding any provision in the Plan and the exhibits thereto (now or as amended), in the Confirmation Order, the jurisdictional limitations of the Medicare Act shall apply.  42 U.S.C. §§ 405(h) & 1395ii.  Such limitations include, but are not limited to Medicare enrollment, certification and reimbursement determinations, and they apply whether the dispute arises from events occurring pre-petition, post-petition or after the confirmation date.  Thus, for example, judicial review of any final Medicare reimbursement determinations after exhaustion of jurisdictionally required administrative remedies would lie in the District Court in accordance with the Medicare Act.  *See* 42 U.S.C. §§ 405(g), 1395ff.

## ARTICLE XI

## OBJECTIONS TO CLAIMS

11.1.   Debtor and/or the Reorganized Debtor, and parties in interest, may object to the allowance of any Claim, whether listed on the schedules filed by the Debtor or any other entity.  Any such objections must be filed within the later of: 60 days of the Effective Date, or 60 days after the filing of a Proof of Claim in the event of a rejection of a contract or lease pursuant to Section 10.1 of the Plan.

## ARTICLE XII

## LIMITATION OF LIABILITY

12.1   The Debtor, the Reorganized Debtor, and all of its directors, officers and agents, including its counsel, accountants, consultants and/or employees, shall not be liable to the Debtor, the Reorganized Debtor, any Creditor or Interest Holder of the Debtor or the Reorganized Debtor, or any other entity for any action taken or omitted to be taken in connection with their respective actions or duties in the Case or under

29

this Plan, except that such liability may be imposed for willful misconduct. The Bankruptcy Court shall have exclusive jurisdiction to resolve any questions concerning any such liability.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1.    Notwithstanding anything in this Plan to the contrary, Debtor shall not be obligated to make any payments towards any claim that is not an Allowed Claim.

13.2.    The Debtor, the Reorganized Debtor and all parties-in-interest, including without limitation any Creditor, shall be required to execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan.  This shall include without limitation any execution by creditors of any UCC termination and mortgage releases and termination.  Unless a lien is expressly preserved in this Plan, as amended, or Order Confirming Plan, it shall be void and of no effect.

13.3.    This Plan and the Confirmation Order shall inure to the benefit of, and be binding upon, all parties in interest and their respective successors and assigns.

13.4    When the Debtor or the Reorganized Debtor has made all payments and obligations required under this Plan all restrictions, negative covenants and other limitations on the Debtor's operations provided herein or in the Order Confirming Plan shall terminate.

30

13.5    Subject to the waiver and release of the Avoidance Actions and D&O Claims and any other applicable terms of this Plan, the Reorganized Debtor shall have the right to commence, continue, amend or compromise all other causes of actions available to the Debtor or the bankruptcy estate, whether or not those causes of action were the subject of a suit as of the Confirmation Date, including but not limited to actions to collect receivables owed to the Debtor.  The Reorganized Debtor specifically reserves its right to commence, continue, amend or compromise all causes of action, other than Avoidance Actions and D&O Claims, whether or not described in the Disclosure Statement.

13.6    Omitted

13.7    For purposes of clarification, the Debtor and the Reorganized Debtor shall have the right to challenge any Claim through the claims objection process set forth in this Plan, which challenge may include but is not be limited to a challenge to any penalty portion of such Claim, the amount and the value of the property which forms the basis for any assessment of taxes and the computation of the tax.  The right to challenge these claims shall include, without limitation, an objection to the assessment of the Debtor's property that may or may not have been made by the respective taxing authority.

13.8    Upon the Effective Date, the Committee shall be disbanded without any further Order of the Court or without the need to file or execute any document.

# DISCLOSURE STATEMENT

## I. DESCRIPTION OF DEBTOR

UPG was formed on April 15, 1999. It is a nonprofit multi-specialty physician practice group, providing primary and specialty care. The organization's stated mission and purpose include:

- To furnish medical care and related services in an academic health care setting through employed physicians, many of whom hold faculty appointments at the Wayne State University School of Medicine.

- To engage in scientific research in the fields of medicine and public health and in related disciplines.

- To coordinate and render professional and administrative services to hospitals and other health care institutes and their patients by physicians, including those who may be employed by UPG.

- To sponsor and conduct activities supporting academic and educational programs including those designed (i) to provide patients needed to carry out graduate and undergraduate medical education programs; (ii) to further medical research; and (iii) to provide members of the public with continuing access to advanced health care services.

- To establish and conduct regulatory compliance programs covering all of UPG, including all participating departments and business units, applicable to health care services furnished to the UPG's patients.

- To engage in other charitable, educational and scientific activities within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 or comparable provisions of subsequent legislation (the "Code").

32

- To acquire, own, dispose of and deal with real and personal property and interests therein and to apply gifts, grants, bequests and devises and the proceeds thereof in furtherance of the purposes of the Organization.

- To do such things and to perform such acts to accomplish its purposes as the Board of Directors may determine to be appropriate and as are not forbidden by Section 501(c)(3) of the Code, with all the powers conferred on nonprofit corporations under the laws of the state of Michigan.

In connection with its mission, UPG maintains affiliations with medical providers throughout the Metro Detroit area, including:

> Barbara Ann Karmanos Cancer Institute
> Beaumont Hospitals
> Crittenton Hospital Medical Center
> Detroit Medical Center
> Henry Ford Health
> System Oakwood
> Healthcare, Inc.
> St. John Providence Health System
> St. Joseph Mercy Oakland

UPG serves a critical safety net role for patients in the metro Detroit community who have no other options. Moreover, the entire mission of the school of medicine depends upon maintaining the integrity of the faculty of which UPG is by far the largest clinical service group. Each decade nearly 3,000 physicians graduate from WSU School of Medicine. Many of those students are taught and trained in area hospitals by UPG physicians, and most will ultimately stay and practice in metropolitan Detroit and throughout the State of Michigan. UPG's success in this

33

reorganization process has implications for much more than the financial health of UPG. The community needs UPG to succeed; the school of medicine and its students need UPG to succeed.

## A.    The Debtor-In-Possession

On 11/07/2018 (the "Petition Date"), Debtor filed a Voluntary Petition under Chapter 11 of Title 11 of the United States Code, §§101 *et. seq.* in the United States Bankruptcy Court for the Eastern District of Michigan, Case No. 18-55138. This Case was assigned to the Honorable Mark Randon. Upon filing the petition for Chapter 11 reorganization, the Debtor became a "Debtor-in-Possession" as that term is understood in the Bankruptcy Code.

## B.    Debtor's Principals and Management

## Background

### Charles J. Shanley, President and CEO

WSU professor of surgery, Charles J. Shanley, MD, FACS was appointed Vice Dean for Clinical Affairs effective February 1, 2018. He assumed the role of President and Chief Executive Officer of UPG on March 1, 2018. A native of Detroit, Dr. Shanley received his BS in biological sciences with highest distinction from Wayne State University in 1983 and his MD with distinction from Wayne State University School of Medicine ("WSUSOM") in 1987 where was elected to Alpha Omega Alpha. Dr. Shanley completed his graduate medical education at the University of Michigan including

34

residencies and fellowships in Surgery, Vascular Surgery and Surgical Critical Care. An accomplished academic surgeon, Dr. Shanley is a Distinguished Fellow of the Society for Vascular Surgery. His research has been funded by the U.S. Army Telemedicine and Advanced Technology Research Center (TATRC); the Michigan Economic Development Corporation (MEDC) and the National Institutes of Health (NIH). Since 2011, he has served on the Health Care Patient Safety and Quality Study Section of the Agency for Health Care Research and Quality (AHRQ) and was appointed to the Circulatory Devices Advisory Panel at the FDA.

Throughout the course of his leadership career, Dr. Shanley has served in a variety of health system operational and management roles including Senior Vice President for Surgical Services and Co-Medical director for William Beaumont Hospital, Royal Oak from 2006-2009 where he was the lead physician executive for one of the largest surgical enterprises by volume in the nation. Surgical services operations at Beaumont included over 900 full-time staff as well as 460 attending and associate surgeons with an annual operating budget of $150 million. While at Beaumont, Dr. Shanley led development and served as the executive director of the Applebaum Surgical Learning Center, a state-of-the-art medical simulation facility at Beaumont that was one of the first in the nation to be accredited as a free-standing educational institute. He has also served as the educational chair for the steering committee that established the Oakland University William Beaumont School of Medicine where he

was also selected a co-finalist for the role of Founding Dean. In 2009, Dr. Shanley was appointed Senior Vice President for Professional (Physician) Services and Associate Chief Medical Officer for Beaumont Health and was primarily accountable for completely restructuring the physician compensation and incentive plan to support a sustainable, mission-based departmental funds flow model in the context of the new medical school.

Upon confirmation, Dr. Shanley will retain his position.

Karen Quinlan Turner, COO

Ms. Turner has an MBA from the Booth School of Business at the University of Chicago, and a BS in Organizational Behavior and Accounting from Northwestern University. Ms. Turner has been the Debtor's Chief Operating Officer since April 2018. Prior to that time, Ms. Turner was Department Administrator, Department of Anesthesiology at Northwestern Medicine (2017 – 2018), Executive Administrator, Department of Surgery at University Of Chicago Medicine (2014-2017), Vice President, Surgical Services and Chief Administrator for the Musculoskeletal Service Line at Wake Forest Baptist Medical Center (2009-2014), Vice President, Surgical Services, and Chief Administrator for the Heart and Vascular, Neurological Sciences, and Radiology Service Lines at Beaumont Health System (2007-2009) and has held various other high level administrative jobs at other institutions. Ms. Turner is

responsible for strategic planning and operations for Debtor. Upon confirmation, Ms. Turner will retain her position.

<u>Diana Goode, CFO</u>

Ms. Goode is the Chief Financial Officer and Vice President Finance for the Debtor, and has taught at the Mike Ilitch School of Business at Wayne State University as part of the part-time faculty. Ms. Goode has a Master of Science in Finance and a Bachelor's degree in Accounting from Walsh College.  Ms. Goode previously was the Senior Associate Vice President Finance & Budget at Wayne State University, and the Chief Operating Officer and Chief Financial Officer for TechTown. Upon confirmation, Ms. Goode will retain her position.

**Compensation**

Prepetition, Dr. Shanley, Ms. Turner and Ms. Goode received the following compensation.  During the bankruptcy, their compensation has stayed at the same level, and it is contemplated that their compensation will continue at the same level with various ordinary course adjustments post-confirmation.

|  | **Charles Shanley** | **Karen Turner** | **Diana Goode** |
|---|---|---|---|
| Pre-filing Annual Salary | $ 325,000 | $ 400,000 | $ 250,000 |
| Total Compensation received 11/8 - 2/28/19 | $ 108,333 | $ 135,333 | $ 84,583 |
| Post-Bankruptcy Salary | $ 325,000 | $ 412,000 | $ 257,500 |

Ms. Turner and Ms. Goode  receive the following benefits that are all or partially funded by UPG:  Medical, dental, vision, life insurance, long term

disability and 403(b) matching contribution. Dr. Shanley has the same benefit package but it is funded by WSU.

### Legal Relationships

As of the Petition Date, UPG was a party to approximately 29 long-term leases for locations situated throughout the Greater Detroit market. UPG also employed approximately 873 individuals (729 full-time and 144 part-time), of which 302 were revenue-producing clinicians.

Many UPG physicians serve as faculty at the school and teach medicine to WSU medical students and hospital residents. Debtor is managed by a Board of Directors which includes, in addition to community members, department chairs and the Dean of the WSU School of Medicine.

UPG is one of the leading academic physician practice groups serving the Detroit Medical Center ("DMC") central campus. UPG and DMC are parties to the Clinical and Administrative Services Agreement between UPG and DMC dated September 25, 2018, effective January 1, 2019. The terms of this agreement are subject to confidentiality provisions.

### C. Description of Debtor's Business and Causes for Chapter 11 Filing

UPG is one of the largest nonprofit multi-specialty physician practice groups in southeast Michigan, providing primary and specialty care, in addition to providing

38

graduate medical education. Debtor's chapter 11 filing was caused by various factors including prior administrations opening satellite offices which had become not cost-effective. The chapter 11 was filed so that Debtor could preserve its core missions as set forth above.

## II.     POST-PETITION EVENTS OF SIGNIFICANCE

### A.     <u>Post-Petition Transfers Outside the Ordinary Course of Business</u>

Debtor has made no post-petition transfers outside the ordinary course of business.

### B.     <u>Chapter 11 Events</u>

This Disclosure Statement is not designed to provide a full, detailed description of the motions filed and orders entered or other developments in the bankruptcy proceeding. Further, the Disclosure Statement does not address every motion filed or order entered in the proceeding. Rather, the Disclosure Statement merely provides a summary of the major motions filed or orders entered. Creditors are urged to review the bankruptcy court docket, which lists every document filed in the bankruptcy case, and the bankruptcy court file, which contains all of the filed documents.

1. **Cash Collateral and Adequate Protection and Postpetition Financing Orders**

Not applicable.

2. **Debtor's First Day Motion for Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Ordinary Course Changes to Cash**

39

**Management System, (III) Continue Administration of Government Funds, and for Other Related Relief [Docket No. 6]("Cash Management Motion")**

Debtor filed its Cash Management Motion which was objected to by various parties. The Court entered an interim Order and a Supplemental Order resolving those objections. One of the issues raised by some of the objecting parties related to certain funds related to the MEPP Program. The Court held that the funds were not property of the Debtor's estate and should be turned over to Wayne State University. The following provisions of those Orders follow:

| | | | |
|---|---|---|---|
| 11/15/2018 | | 45<br>(9 pgs) | Interim Order Granting Debtor's First Day Motion for Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Ordinary Course Changes to Cash Management System, (III) Continue Administration of Government Funds, and for Other Related Relief (Related Doc #6). (kel) (Entered: 11/15/2018) |

10.     The MEPP Funds held by the Debtor in the segregated account are not property of the estate in these proceedings, and constitute property of the type described in 11 USC § 541(b)(1) ("any power that the debtor may exercise solely for the benefit of an entity other than the debtor"), except possibly to the extent of $2,008,551.24 million the Debtor claims is owed for administrative fees due under the terms of the "Funds Transfer Agreement" under which the Debtor holds the MEPP Funds.

11.     The Debtor is authorized to maintain any existing arrangements for the management of the remaining MEPP Funds which are in its possession but not property of the estate.  This includes maintaining the existing segregated account and disbursing funds as directed by Wayne State University, except to the extent of

41

the sum of $2,008,551.24, which the Debtor claims is the amount owed to it for owed but unpaid administrative fees, without any limitation under the Bankruptcy Code or Rules; without the reporting requirements otherwise applicable to funds in the possession of a debtor-in-possession; without the inclusion of disbursements in Monthly Operating Reports; and without charge for quarterly fees owed to the Office of the U.S. Trustee.

| | | | |
|---|---|---|---|
| 01/30/2019 | | 260 (6 pgs) | Supplement to Final Order Granting Debtor's First Day Motion for Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Ordinary Course Changes to Cash Management System, and for Other Related Relief [Docket No. 100] (RE: related document(s)45 Order (Generic)). (kel) (Entered: 01/30/2019) |

2.    The entirety of the MEPP Funds are not property of the Debtor's estate in this proceeding pursuant to 11 U.S.C. § 541(a).

3.    For avoidance of confusion, nothing in this Order determines whether the Debtor is owed fees for services provided. The Debtor is not owed any fees from the MEPP Funds which are the subject of this Order.

### 3. Motion to Excuse Appointment of Ombudsman [Docket No. 8]

Debtor filed its motion to excuse appointment of an ombudsman because, inter alia, Debtor has a robust patient safeguard protocol as do the hospitals where the UPG doctors practice.  The Court granted the Debtor's motion over objection. [Docket 99].

### 4. Motion for Order Under Bankruptcy Code Sections 105, 363(b) and 503(c)(3) Approving the Implementation of the Key Employee Retention Plan, Notice of Motion, Motions for Relief from Stay [Docket No. 71]["KERP Motion"]

Debtor filed its KERP Motion to retain key employees, and to incentivize all employees to stay with UPG during the chapter 11 process by providing severance benefits based upon various their wages and how long they had been employed by UPG.  Over various objections which were resolved by stipulation , the Court granted Debtor's motion as to the Key Employee Retention Program [Docket 107]. As to the Severance Program, Debtor and the Unsecured Creditors Committee stipulated to Debtor's motion with the following modifications [Docket 271],

a. Employees who locate new employment within the period of time between being notified that they are being terminated and their final date of employment with the Debtor will not be entitled to severance benefits.

b. Aside from the foregoing, the Debtor shall have absolute discretion and authority to disburse severance benefits to employees in the amount it deems necessary and appropriate, provided however, the gross amount of any such disbursements incurred and treated as a Chapter 11 administrative expense during the pendency of this case and prior to confirmation of a Chapter 11 Plan shall not exceed the sum of two hundred seventy thousand and no/100 ($270,000) dollars.

### 5. Motions for Relief from Stay

Three claimants have filed motions for relief from stay to allow them to pursue insurance policies in cases where Debtor was a named party. Debtor has not objected to these requests for relief from stay as the requests were reasonable, were likely to be granted by the Court, and would not unnecessarily affect the Debtor's estate or its operations. The following Orders granting relief from stay have been entered:

| | | | |
|---|---|---|---|
| 12/26/2018 | [127](#)<br>(2 pgs) | Order Granting Limited Relief from the Automatic Stay for Leslie Anderson (Related Doc # [47](#)). (AGS) (Entered: 12/26/2018) |
| | | | |
| 01/02/2019 | [147](#)<br>([2 pgs](#)) | Order Granting Alvan Ribiat Limited Relief From the Automatic Stay for Cause. (Related Doc # [72](#)). (slh) (Entered: 01/02/2019) |
| | | | |
| 01/24/2019 | [245](#)<br>([2 pgs](#)) | Order Granting Limited Relief From Automatic Stay by Creditor Sharon Tucker (Related Doc # [114](#)). (Cotton, N) (Entered: 01/24/2019) |

## 6. Motions regarding executory contracts/unexpired leases

Debtor has filed various motions to reject various unexpired leases, or to extend the time to assume or reject various other unexpired leases. A summary of the status of various leases to which Debtor was a party to on the Petition Date follows:

| Landlord | Location | Disposition |
|---|---|---|
| | | |
| **Detroit** | | |
| Jewish Vocational - | 50 E. Canfield - Rent | Lease rejected pursuant to Order entered on March 12, 2019, however Debtor has or is in process of negotiating a new lease with lessor for a substantially reduced footprint and rent. |
| WSU | Tolan Park - 3901 Chrysler Dr | Debtor maintains a month-to-month occupancy of this property and is negotiating with the Lessor to formalize a longer term lease of the space. |
| VHS of Michigan | 4201 St. Antoine 5A | |

| | | |
|---|---|---|
| VHS of Michigan | 4160 John R Suite 917 | |
| VHS of Michigan | 3901 John R 7622/7 Brush | Lease rejected pursuant to Order entered on January 23, 2019 |
| VHS of Michigan | 4201 St. Antoine 4C | |
| VHS of Michigan | 4160 John R 925 | Lease rejected pursuant to Order entered on January 7, 2019 |
| VHS of Michigan | 4160 John R 930 | Lease rejected pursuant to Order entered on January 7, 2019 |
| WSU | 4717 St. Antoine (KEI) | |
| VHS of Michigan | 261 Mack Ave, Detroit | Lease rejected pursuant to Order entered on January 23, 2019 |
| VHS of Michigan | 4717 St. Antoine | |
| VHS of Michigan | 3990 John R Rm 8714 (old 3705) | Lease rejected pursuant to Order entered on January 23, 2019 |
| VJ Maclin | 20400 Livernois | Lease rejected pursuant to Order entered on January 23, 2019 |
| WSU | Tolan Park - 3901 Chrysler Dr | Debtor maintains a month-to-month occupancy of this property and is negotiating with the Lessor to formalize a longer term lease of the space. |
| | | |
| **Southfield** | | |
| Universal Property | 26400 W. 12 Mile Suite 20 | All suites located in Southfield are part of a single lease, however, Lessor and Debtor agreed to a rejection of the amendment pertaining to Suite 20 pursuant to Order entered on January 31, 2019, thereby allowing Lessor to lease the space to a new tenant.  Additionally, Lessor and Debtor continue to negotiate the Debtor's continued occupation of a smaller footprint and reduced rent for a portion of the space. |

46

| | | |
|---|---|---|
| Universal Property | 26400 W. 12 Mile Suite 140 | All suites located in Southfield are part of a single lease, however, Lessor and Debtor agreed to a rejection of the amendment pertaining to Suite 20 pursuant to Order entered on January 31, 2019, thereby allowing Lessor to lease the space to a new tenant. Additionally, Lessor and Debtor continue to negotiate the Debtor's continued occupation of a smaller footprint and reduced rent for a portion of the space. |
| Universal Property | 26400 W. 12 Mile Suite 15 (REI) | All suites located in Southfield are part of a single lease, however, Lessor and Debtor agreed to a rejection of the amendment pertaining to Suite 20 pursuant to Order entered on January 31, 2019, thereby allowing Lessor to lease the space to a new tenant. Additionally, Lessor and Debtor continue to negotiate the Debtor's continued occupation of a smaller footprint and reduced rent for a portion of the space. |
| Universal Property | 26400 W. 12 Mile Suite 110 | All suites located in Southfield are part of a single lease, however, Lessor and Debtor agreed to a rejection of the amendment pertaining to Suite 20 pursuant to Order entered on January 31, 2019, thereby allowing Lessor to lease the space to a new tenant. Additionally, Lessor and Debtor continue to negotiate the Debtor's continued occupation of a smaller footprint and reduced rent for a portion of the space. |

| | | |
|---|---|---|
| Universal Property | 26400 W. 12 Mile Suite 50 and 60 | All suites located in Southfield are part of a single lease, however, Lessor and Debtor agreed to a rejection of the amendment pertaining to Suite 20 pursuant to Order entered on January 31, 2019, thereby allowing Lessor to lease the space to a new tenant.  Additionally, Lessor and Debtor continue to negotiate the Debtor's continued occupation of a smaller footprint and reduced rent for a portion of the space. |
| Universal Property | 26400 W. 12 Mile Suite 111 | All suites located in Southfield are part of a single lease, however, Lessor and Debtor agreed to a rejection of the amendment pertaining to Suite 20 pursuant to Order entered on January 31, 2019, thereby allowing Lessor to lease the space to a new tenant.  Additionally, Lessor and Debtor continue to negotiate the Debtor's continued occupation of a smaller footprint and reduced rent for a portion of the space. |
| | | |
| **Dearborn** | | |
| Dearborn Real Estate - | 18100 Oakwood Suite 300 | Debtor has or is in process of negotiating a new lease with lessor for a substantially reduced footprint and rent. |
| Greenfield Med Ctr Dearborn | 5479 Schaefer-- Timeshare | Lease rejected pursuant to Order entered on January 7, 2019 |
| Oakwood Hospital | 18181 Oakwood Ste 402/401 | Lease rejected pursuant to Order entered on March 7, 2019 |
| Dearborn Schaefer | Dearborn Town Cntr  Ste. 165/260 | Lease rejected pursuant to Order entered on January 7, 2019 |
| | | |
| **Rochester** | | |

| | | |
|---|---|---|
| Kirco | 1135 W University, Suite 250 | Lease rejected pursuant to Order entered on January 7, 2019 |
| Kirco | 1136 W University, Suite 440 | Lease rejected pursuant to Order entered on January 7, 2019 |
| | | |
| **Troy** | | |
| PRT Original - consolidating. Admin space, Maple Surgery | 1560 Stephenson Hwy | Debtor has or is in process of negotiating a new lease with lessor for a substantially reduced footprint and rent. |
| PRT - Amendment #1 | 1560 Stephenson Hwy | Debtor has or is in process of negotiating a new lease with lessor for a substantially reduced footprint and rent. |
| PRT - Amendment #2 | 1560 Stephenson Hwy | Debtor has or is in process of negotiating a new lease with lessor for a substantially reduced footprint and rent. |
| | | |
| **Miscellaneous** | | |
| VHS of Michigan | Huron-Valley Sinai Hospital | Lease rejected pursuant to Order entered on January 23, 2019 |
| Mehregan R.E. Mgmt - | 1310 N. Macomb, Monroe | Lease rejected pursuant to Order entered on January 23, 2019 |
| Highland Meadows | 16836 Newburg, Livonia | |
| Southland Eye Clinic | 15055 Plaza Dr, Taylor | Lease rejected pursuant to Order entered on January 23, 2019 |
| BMC Lake Orion | 1455 S Lapeer Suite 110 | Lease rejected pursuant to Order entered on January 23, 2019 |
| Port Huron Eye | 4190  24th Ave | Lease consensually terminated on December 31, 2018 |
| College Hill Apartments | 510 College Hill, Grand Rapids | Lease rejected pursuant to Order entered on February 13, 2019 |

49

| Westshore Property Mgmt | 18372 N. Ridge Ct., Spring Lake | Lease rejected pursuant to Order entered on January 23, 2019 |
|---|---|---|

As indicated previously, a motion to extend the time to assume or reject Debtor's unexpired leases has been filed [Docket 283], and the motion and the relief requested are incorporated by reference into the Plan. A bridge Order extending the time to assume or reject was entered by the Court [Docket 285], which provided that "[t]he deadline for the Debtor to assume or reject the Unexpired Leases is hereby extended through and including the date of entry of an Order relative to Debtor's Motion to Extend Deadline for Assumption/Rejection." The motion to extend requests, *inter alia*, the following relief, "[t]he Debtor shall have through the earlier of: June 5, 2019; or the date of confirmation of a Chapter 11 plan in this case, within which to assume, assume and assign, or reject unexpired nonresidential real property leases". An order granting the relief requested was entered on March 15, 2019 [Docket 325].

### 7. Formation of Unsecured Creditors Committee

On or about 11/26/2018, the Office of the United States Trustee appointed an official creditors committee. The Committee shall be disbanded on the Effective Date.

### 8. Motion for Rule 2004 Examination [Docket 160}

Debtor, interested party John Horvat, and Wayne State University objected to University Pediatricians' motion for a rule 2004 examination [Docket 160] based upon, *inter alia*, the scope of what was being requested. The Court denied University

50

Pediatricians' motion without prejudice [Docket 257]. Prior to the filing of this *Combined Plan and Disclosure Statement*, University Pediatricians filed a proof of claim against the Debtor and another motion for Rule 2004 examination [Docket 326], which the Debtor intends to respond to.

**9. Wayne State University Financial Accommodations**

In order to assist the Debtor in exiting chapter 11, Wayne State University, after extensive negotiations with the Debtor, has agreed to provide certain financial accommodations ("WSU Financial Accommodations") as set forth in the Plan, subject to the terms of the Plan and the RSA. A general summary of the primary WSU Financial Accommodations is set forth in Section 4.1 of the Plan, subject in all respects to the terms of the RSA.

**10. The Plan and Disclosure Statement**

Debtor has filed its *Combined Disclosure Statement and Plan of Reorganization*. The Debtor believes that its Plan of Reorganization is feasible, as demonstrated by the financial projections which include the impact of the support of the WSU Financial Accommodations. Accordingly, the Debtor is extremely confident in its ability to meet the financial projections and satisfy claims under the Plan.

**C.  Pending and Contemplated Litigation Involving Debtor and Releases**

There is no pending or contemplated litigation involving the Debtor other than the litigation on the attached Exhibit. The Debtor reserves the right to pursue any entities for which Debtor has a claim. All avoidance actions under chapter 5 of the Bankruptcy Code shall be waived and not retained under the Plan.

As consideration for the WSU Financial Accommodations, Debtor and the estate are releasing WSU and FMRE, and all current and former agents, officers, directors, members of board of governors, employees, attorneys and their respective heirs, successors and assigns, of all claims, whether known or unknown, except for ordinary course contractual claims. All claims, whether known or unknown, against all of UPG's current and former agents, officers, directors, members of board of governors, employees, attorneys and their respective heirs, successors and assigns, are hereby released.

### D.      Insider Transactions

Prior to and after the Petition Date, the Debtor made payments for value and in the ordinary course of its business, including on account of employee obligations as well as payments to vendors, contract and lease counter-parties, and other institutions and companies, including, but not limited to, WSU and the DMC.

### III.      ASSETS AND LIABILITIES

### A.      Liquidation Analysis

The Bankruptcy Code requires that the Debtor do a liquidation analysis, however, the Debtor does not intend to liquidate. One reason for that is that the value of the Debtor as an operating entity is greater than if it were liquidated. Debtor's Liquidation Analysis accompanies this Plan and Disclosure Statement.

**B.** **Risks, Conditions and Assumptions In Liquidation Analysis**

The risks, conditions and assumptions are outlined in the Liquidation Analysis.

**C.** **Causes of Action**

At this time, there is no pending litigation in the Bankruptcy Court in the form of adversary proceedings, and Debtor is not planning to file lawsuits against any entities at this time. Pending litigation as of the Petition Date is disclosed in Debtor's Statement of Financial Affairs, which has been filed with the Bankruptcy Court and is available upon request. Debtor reserves its right to pursue any claims for the benefit of the estate which have not been waived or released.

**D.** **Priority and Secured Claims and Administrative Expenses**

Pursuant to the filed and scheduled claims, to which Debtor does not stipulate, there are the following secured claims, reclamation claims, and priority claims:

| Secured Claims / Reclamation Claims | Everbank Commercial Finance (Nasolaryngoscope) | $15,108.93 |
|---|---|---|
| | Everbank Commercial Finance (Pentax/Kaypentax nasolaryngoscope) | $35,850.78 |
| | Chemical Bank | $3,921.76 |

53

| | | |
|---|---|---|
| | Dell Marketing, L.P. | $2,187.67 |
| | Hewlett-Packard Financial Services Company | $214,698.73 |
| | McKesson entities | $340,880.09 |
| TOTAL SECURED / RECLAMATION CLAIMS | | $612,647.96 |
| | | |
| Priority Claim | Jeffery Kohlitz | $16,250.00 |

E. **Unsecured Claims**

Debtor believes that there are general unsecured claims in the amount of $17,665,119.[2]

F. **Guaranteed Debt**

There is no guaranteed debt.

---

[2] This amount was derived from the Debtor's review of its schedules, filed proofs of claim, and determination as to the current claim amount.

54

## V.    <u>IMPLEMENTATION OF PLAN</u>

### A.  Summary of Plan Treatment.

See Plan Articles II and III.

### B.    <u>Financial Information</u>

The information contained in this Disclosure Statement has not been subject to a certified audit. The information has been compiled from the records of Debtor and their review by Debtor's financial professionals, AlixPartners, and is true and accurate to the best of Debtor's knowledge, information and belief. The information is also based on financial projections prepared by Debtor, with the assistance of AlixPartners.

### C.    <u>Projections</u>

Accompanying this Disclosure Statement are cash flow projections prepared by the Debtor, with the assistance of AlixPartners which cover the time period in which Debtor proposes to effectuate payments under the Plan. Since the cash flow projections are based on estimates and assumptions which are inherently subject to uncertainty and variation depending upon evolving events, neither the Debtor, nor its principals, professionals, nor its management warrant that the results reflected in the cash flow projections will be achieved.

These cash flow projections indicate that Debtor will generate a positive cash flow going forward sufficient to meet all of its obligations to creditors under the Plan. The projections give an example of the payments required to be made under the Plan

and demonstrate how the distributions to creditors will affect Debtor's cash flow. Any fluctuations in revenue and expenses set forth in the projections are based upon current market conditions, historical growth and anticipated growth. Where there is a conflict between the terms of the Plan and the projections, the terms of the Plan shall control. The projections are being provided for illustrative purposes.

A summary of Debtor's operating results relating to the Debtor's post-petition operations also accompanies this Plan.

A summary of Debtor's operating results prior to the commencement of Debtor's bankruptcy proceeding also accompanies the Plan.

### D. Post-Petition Details

Debtor proposes to continue its operations with the same management structure. Debtor is in the process of outsourcing its revenue cycle management (RCM). A Motion for approval of the Debtor's execution of contracts necessary to effect outsourcing of the RCM is pending before the Court. As indicated above, Debtor has also rejected or renegotiated leases to have the proper "footprint" or amount of space in the proper locations. These efforts continue even as the Plan is being considered. Finally, the Debtor is heavily engaged in restructuring its business relationship with Wayne State University, and embarking on a complete overhaul of its physician compensation structure, to achieve parity between clinical, revenue-generating work performed and

56

income; and leaving compensation for teaching to the University. As indicated above, these efforts are continuing in parallel to confirmation of the Debtor's Plan.

    E.    **Tax Ramifications**

       1.  **To Debtor**

Debtor believes that any forgiveness of indebtedness which may result from a discharge granted by the confirmation of the Plan will not result in any significant adverse tax consequence to the Debtor, which is a not for profit entity.

       2.  **To Creditors**

The tax consequences to each Creditor resulting from confirmation of the Plan may vary depending upon each Creditor's particular circumstances. Debtor recommends that creditors or holders of Claims obtain independent tax counsel to advise them as to the tax consequences of the Plan.

# VI.  **LEGAL REQUIREMENTS**

*A. Voting procedures*
*Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interest, that are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.*

*Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.*

*Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or(b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.*

*Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the court.*

*Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.*

*A ballot that is not received by the deadline will not be counted.*

*If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.*

*B. Acceptance*

*The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.*

*C. Confirmation*

*11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.*

*Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:*

*1. Each class of impaired creditors and interest must accept the plan, as described in paragraph VII.B., above.*

*2. Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.*

*D. Modification*

*The debtor reserves the right to modify or withdraw the plan at any time before confirmation.*

*E. Effect of confirmation*

*If the plan is confirmed by the Court:*

*1. Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.*

*2. Except as provided in the plan and in 11 U.S.C. § 1141(d):*

*(a) In the case of a corporation that is reorganizing and continuing business:*
*(1) All claims and interests will be discharged.*

59

*(2) Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.*

*(b) In the case of a corporation that is liquidating and not continuing its business:*
*(1) Claims and interests will not be discharged.*
*(2) Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.*

*(c) In the case of an individual or husband and wife:*
*(1) Claims will be discharged, except as provided in 11 U.S.C. §§ 523 and 1141(d).*
*(2) Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 1141(d)).*

*Because the case is a reorganizing business, Section E. 2(a) above applies and 2(b) and 2(c) do not apply.*

**DEBTOR**

By:       /s/ Charles J. Shanley, M.D.
                Charles J. Shanley, M.D.,
Its:        President and CEO

Dated:      3/24/2019

Prepared By:

Prepared By:
STEINBERG SHAPIRO & CLARK       Robert N. Bassel  (P 48420)
Mark H. Shapiro (P43134)           Co-counsel for Debtor
Attorney for Debtor                P.O. Box T
25925 Telegraph Road, Suite 203      Clinton, MI 49236
Southfield, MI 48033              (248) 677-1234
248-352-4700                   bbassel@gmail.com
shapiro@steinbergshapiro.com

## Prepetition Results of Operations

| (000's) | FY2015 | FY2016 | FY2017 | FY2018 |
|---|---|---|---|---|
| **Operating Revenue:** | | | | |
| Net Patient Services [1] | $ 134,097 | $ 132,382 | $ 118,107 | $ 103,465 |
| Contract Revenue | 25,929 | 23,335 | 22,293 | 20,141 |
| Teaching | 18,590 | 17,306 | 15,700 | 13,721 |
| Medical Administration | 7,478 | 6,354 | 6,756 | 6,641 |
| Salary Reimbursement | 7,177 | 6,405 | 5,331 | 5,105 |
| Other Revenue | 4,218 | 6,587 | 11,573 | 8,882 |
| Bad Debt | (573) | (876) | 428 | (4,843) |
| **Total Operating Revenue** | **196,915** | **191,493** | **180,187** | **153,111** |
| | | | | |
| **Operating Expenses:** | | | | |
| Physician Compensation | 81,407 | 75,365 | 88,338 | 79,104 |
| Non-Physician Compensation | 60,889 | 54,752 | 44,105 | 38,011 |
| Depreciation | 3,470 | 3,070 | 2,211 | 1,364 |
| Other Operating | 48,732 | 48,455 | 40,149 | 38,061 |
| Deans Tax | 13,180 | 11,189 | 5,646 | 5,942 |
| **Total Operating Expenses** | **207,679** | **192,830** | **180,449** | **162,482** |
| | | | | |

62

| | | | | |
|---|---|---|---|---|
| **Operating Income** | **(10,764)** | **(1,338)** | **(261)** | **(9,371)** |
| | | | | |
| **Non-Operating Inc (Exp)** [2] | **(2,326)** | **334** | **534** | **1,228** |
| | | | | |
| **Surplus (Deficit)** | **$ (13,090)** | **$ (1,004)** | **$ 272** | **$ (8,143)** |
| | | | | |
| **% of Operating Revenue** | | | | |
| Physician Compensation | 41.3% | 39.4% | 49.0% | 51.7% |
| Non-Physician Compensation | 30.9% | 28.6% | 24.5% | 24.8% |
| Other Operating Expenses | 26.5% | 26.9% | 23.5% | 25.7% |
| Dean's Tax | 6.7% | 5.8% | 3.1% | 3.9% |
| Operating Income | -5.5% | -0.7% | -0.1% | -6.1% |
| Surplus (Deficit) | -6.6% | -0.5% | 0.2% | -5.3% |

# Post-Petition Results of Operations

**Wayne State University Physician Group**
Income Statement - Summary Accounts
FY2019 - Unaudited

| | FY2019 YTD | | | | |
|---|---|---|---|---|---|
| | Oct 18 | Nov 18 | Dec 18 | Jan 19 | Feb 19 |
| Net Patient Services Revenue | 6,940,493 | 6,261,866 | 6,292,106 | 3,523,407 | 5,061,197 |
| PEPPAP Revenue | 855,852 | 855,852 | 1,126,393 | 563,197 | 563,197 |
| Other Revenue | 139,394 | 108,751 | 101,438 | 68,156 | 2,060 |
| Program Support Revenue | 183,366 | 200,909 | 155,027 | 194,315 | (12,067) |
| Medical Administration Revenue | 505,560 | 521,734 | 506,569 | 580,048 | 480,798 |
| Non Clinical Contracts Revenue | 39,334 | 81,482 | 86,787 | 43,379 | 97,197 |
| Teaching Revenue | 888,327 | 888,327 | 1,040,088 | 843,562 | 32,698 |
| Salary and Expense Reimb Rev | 373,246 | 469,907 | 321,706 | 368,407 | 372,874 |
| Clinical Contracted Revenue | 1,287,068 | 1,262,859 | 1,118,235 | 4,429,660 | 2,470,734 |
| Service Revenue | 19,119 | (67,467) | 23,162 | 601,659 | 142,082 |
| Bad Debt Expenses | 11,100 | - | - | - | (23,431) |
| | | | | | |
| **TOTAL OPERATING REVENUE** | **11,242,860** | **10,584,220** | **10,771,511** | **11,215,791** | **9,187,338** |
| | | | | | |
| FTE Faculty Compensation | 4,773,215 | 4,920,098 | 4,667,406 | 4,758,430 | 1,583,459 |
| FTA Faculty Compensation | 661,101 | 604,529 | 620,396 | 538,563 | 549,277 |
| Physician Compensation | 779,589 | 876,319 | 961,221 | 837,067 | 729,941 |
| Non-Physician Provider Comp | 277,117 | 246,479 | 311,727 | 313,627 | 284,449 |
| Staff Compensation | 2,865,359 | 2,573,355 | 2,542,867 | 2,588,260 | 2,258,307 |
| Trainee Compensation | 6,003 | - | 6,003 | 27,369 | 6,003 |
| Fringe Benefits Allocations | 107,042 | (209,360) | (100,930) | (120,450) | (345,218) |
| Employee Related Expenses | 106,549 | 134,921 | 189,437 | 141,475 | 242,917 |
| Office and Admin Expenses | 343,948 | 339,454 | 303,188 | 337,544 | 256,479 |
| Non-Capital Equipment | 2,907 | 9,277 | 8,444 | 1,784 | 3,408 |
| Depreciation and Amortization | 95,089 | 93,742 | 92,663 | 92,073 | 91,323 |
| Insurance | 345,653 | 345,161 | 159,365 | 281,331 | 291,097 |
| Purchased Services | 939,410 | 1,035,479 | 847,389 | 1,244,601 | 1,195,212 |
| Clinic Expenses | 721,600 | 736,505 | 878,468 | 686,495 | 648,685 |
| Occupancy Expenses | 559,555 | 676,609 | 558,480 | 539,124 | 543,188 |
| Dean's Tax | 375,084 | 47,244 | (47,244) | - | - |
| | | | | | |
| **TOTAL OPERATING EXPENSE** | **12,959,221** | **12,429,812** | **11,998,879** | **12,267,292** | **8,338,526** |
| | | | | | |
| **TOTAL OPERATING REVENUE LESS EXPENSE** | **(1,716,361)** | **(1,845,592)** | **(1,227,368)** | **(1,051,501)** | **848,812** |
| | | | | | |
| Intercompany Transactions | | | | | |
| Non Operating Revenue | 43,995 | 55,679 | 669,001 | 30,690 | 60,425 |
| Non Operating Expense | 8,861 | (500,394) | (407) | (237) | (78,367) |
| **TOTAL SURPLUS/(DEFICIT)** | **(1,663,505)** | **(2,290,307)** | **(558,774)** | **(1,021,048)** | **830,870** |

**UPG**
**Projected Income Statement**
**(000's)**

| | Unaudited FY2018 | FCST FY2019 | FCST FY2020 | FCST FY2021 | FCST FY2022 | FCST FY2023 |
|---|---|---|---|---|---|---|
| Patient Services and PEPPAP | $ 103,465 | $ 86,790 | $ 93,604 | $ 96,780 | $ 96,780 | $ 96,780 |
| Medical Admin. and Contract Revenue | 26,782 | 21,354 | 21,356 | 21,356 | 21,356 | 21,356 |
| Teaching Revenue | 13,721 | 3,795 | 52 | 52 | 52 | 52 |
| Salary and Expense Reimb Rev | 5,105 | 3,946 | 3,708 | 3,708 | 3,708 | 3,708 |
| Program Support Revenue | 6,316 | 1,574 | 1,380 | 1,380 | 1,380 | 1,380 |
| Other Income | 2,566 | 2,321 | 2,398 | 2,398 | 2,398 | 2,398 |
| Bad Debt Expenses | (4,843) | 11 | - | - | - | - |
| **TOTAL OPERATING REVENUE** | **153,111** | **119,791** | **122,496** | **125,673** | **125,673** | **125,673** |
| | | | | | | |
| Employee Costs | 118,850 | 96,635 | 85,559 | 85,666 | 85,666 | 85,666 |
| Office and Admin Expenses | 4,571 | 3,941 | 3,940 | 3,940 | 3,940 | 3,940 |
| Non-Capital Equipment | 122 | 83 | 83 | 83 | 83 | 83 |
| Depreciation and Amortization | 1,364 | 1,112 | 1,108 | 1,108 | 1,108 | 1,108 |
| Insurance | 3,235 | 3,434 | 3,419 | 3,419 | 3,419 | 3,419 |
| Purchased Services | 9,985 | 11,188 | 13,993 | 14,524 | 14,524 | 14,524 |
| Clinic Expenses | 8,839 | 8,327 | 8,550 | 8,722 | 8,722 | 8,722 |
| Occupancy Expenses | 9,574 | 5,830 | 4,065 | 4,065 | 4,065 | 4,065 |
| Dean's Tax | 5,942 | 375 | - | - | 726 | 2,903 |
| **TOTAL OPERATING EXPENSES** | 162,482 | 130,925 | 120,716 | 121,527 | 122,253 | 124,430 |
| | | | | | | |
| **OPERATING INCOME** | **(9,371)** | **(11,134)** | **1,781** | **4,147** | **3,421** | **1,243** |
| | | | | | | |
| Other Income (Expense) | 1,228 | 344 | - | - | - | - |
| Interest | - | (25) | (158) | (223) | (287) | (331) |
| Chapter 11 Exit Impact (1) | - | (3,897) | - | - | - | - |
| Restructuring Expenses (2) | - | (2,161) | - | - | - | - |
| **NET SURPLUS (DEFICIT)** | **$ (8,143)** | **$ (16,873)** | **$ 1,622** | **$ 3,924** | **$ 3,134** | **$ 912** |

Notes:
1) Includes estimated $500k of administrative costs and $4,972k of non-cash balance sheet adjustments related to exit
2) Includes professional fee estimates and approved severance

**UPG**
**Projected Cash Flow**

(000's)

|  | FCST FY2019 | FCST FY2020 | FCST FY2021 | FCST FY2022 | FCST FY2023 |
|---|---|---|---|---|---|
| Net Surplus (Deficit) | $ (16,873) | $ 1,622 | $ 3,924 | $ 3,134 | $ 912 |
| Add: Depreciation | 1,092 | 1,108 | 1,108 | 1,108 | 1,108 |
| Add: Non-Cash Exit Impact | 3,397 | - | - | - | - |
| **Changes in working capital:** | | | | | |
| Accounts Receivable | (3,436) | 3,279 | 2,209 | - | - |
| Other assets | (475) | - | - | - | - |
| Payables | (5,014) | - | - | - | - |
| Other liabilities | 12,504 | (9) | (9) | 726 | 2,903 |
| Cash flow from Operations | (8,805) | 6,000 | 7,232 | 4,968 | 4,923 |
| **Cash Flow from Investing:** | | | | | |
| Capital Spending | (333) | (1,000) | (1,000) | (1,000) | (1,000) |
| Other | 20 | - | - | - | - |
| Cash flow from Investing | (313) | (1,000) | (1,000) | (1,000) | (1,000) |
| **Cash Flow from Financing:** | | | | | |
| PEPPAP Administrative | (55) | - | - | - | - |
| Exit Revolver | 5,000 | - | (2,500) | - | - |
| Exit Term Debt | 1,611 | 1,611 | 1,611 | 1,311 | 460 |
| Exit Pre-Petition Obligation | (1,611) | (1,611) | (1,611) | (1,611) | (1,611) |
| Cash Flow from Financing | 4,945 | - | (2,500) | (300) | (1,151) |
| Cash Flow | (4,173) | 5,000 | 3,732 | 3,667 | 2,772 |
| Beginning Cash | 9,309 | 5,136 | 10,136 | 13,867 | 17,534 |
| Ending Cash | $ 5,136 | $ 10,136 | $ 13,867 | $ 17,534 | $ 20,306 |

University Physician Group
**Hypothetical Chapter 7 Liquidation Analysis**
**As of December 31, 2018**
**Assumed Conversion Date of July 26, 2019**

*(000's omitted)*

| Description | 31-Dec-18 Estimated Balance Sheet | Estimated Chapter 7 Liquidation Recovery | | | Notes |
|---|---|---|---|---|---|
| | | Low | Mid | High | |
| **ASSETS** | | | | | |
| Cash | $ 10,087 | $ 1,090 | $ 2,165 | $ 3,240 | Estimated low case cash balance at 7-26-19 based on current cash burn rate. Estimated high case cash balance at 7-26-19 based on 50% of current cash rate. |
| Accounts Receivable: | | | | | |
| Patient services (net of allow. and contractual adj.) | 9,495 [3] | 2,848 | 5,459 | 8,070 | Assumes 50% will be owing from DMC as of 7-26-19 (under DMC/UPG contract) with assumed 10% low case and 90% high case recovery; remaining A/R is assumed collected at 50-80% recovery rate |
| Medicaid fee-for service and SNAF (i.e., MEPP) | 7,549 | 3,019 | 4,907 | 6,794 | Assumes 50% will be owing from DMC as of 7-26-19 (under DMC/UPG contract) with assumed 10% low case and 90% high case recovery; remaining A/R is assumed collected at 70-90% recovery rate |
| Contracted services (i.e., teaching revenue) | 9,283 [1] | 1,452 | 2,178 | 2,904 | $7.3M is aged <180 days; assume 20-40% recovery of <180 day A/R based on assumed breaches of UPG's contractual obligations on account of conversion. |
| Malpractice insurance recoveries | 10,402 | - | - | - | Assume all proceeds go to claimants and there is no excess of claims over ins. proceeds. |
| Subtotal Accounts Receivable | $ 36,728 | $ 7,320 | $ 12,544 | $ 17,768 | |
| Prepaid Expenses | $ 1,375 | $ - | $ 172 | $ 344 | Assume 0-25% recovery. |
| Furniture, Fixtures & Equipment, at cost | 28,074 | | | | |
| Accumulated depreciation | (26,161) | | | | |
| Furniture, Fixtures & Equipment, net | $ 1,913 | $ 500 | $ 750 | $ 1,000 | Assume $500K - $1,000K, net of expenses. |
| Investments in Affiliates | $ 4,137 | $ 232 | $ 347 | $ 463 | Jan 2019 FMV "in place and use" appraisal of Maple Surgery Center of $926K; assume 25-50% recovery. |
| **TOTAL ASSETS** | $ 54,240 | $ 9,141 | $ 15,978 | $ 22,815 | |
| Add avoidance actions | - | - | - | - | Debtor has not investigated; Chapter 7 prof. fees to investigate not considered. |
| **TOTAL ASSETS AFTER AVOIDANCE ACTIONS** | $ 54,240 | $ 9,141 | $ 15,978 | $ 22,815 | |
| Less estimated costs of Chapter 7 Liquidation: | | | | | |
| Chapter 7 trustee statutory fees | | (183) | (320) | (456) | At 2% of gross proceeds |
| Chapter 7 professionals (lawyer, accountant) | | (1,500) | (1,125) | (750) | Estimated at $750K-$1500K |
| Other wind-down costs (rent, records retention, server preservation) | | (1,000) | (750) | (500) | Estimated $500K-$1,000K |
| Subtotal - estimated costs of Chapter 7 liquidation | | $ (2,683) | $ (2,195) | $ (1,706) | |
| Estimated Proceeds Available for Distribution | | $ 6,459 | $ 13,784 | $ 21,109 | |
| Secured claims | | (39) | (39) | (39) | Capital lease |
| Chapter 11 Administrative Claims: | | | | | |
| Post-petition liabilities excluding payroll | | (2,162) [2] | (2,162) | (2,162) | [2] Per 12-31-18 MOR. |
| Professional fees | | (1,250) | (1,000) | (750) | Assumed $750K - $1,250K. |
| Post-petition accrued vacation pay | | (1,950) | (1,463) | (975) | 483 vacation eligible employees; average annual salary of $70K; avg. tenure = 8 years; max cap vacation hours = 280; assume 75% of eligible employees have accrued vacation at conversion date of 80 hours (high case) and 160 hours (low case). |
| Unsecured priority claims | | (400) | (300) | (200) | Estimate of other employee benefits. |
| Estimated Proceeds Available for Distribution to GUC | | $ 657 | $ 8,820 | $ 16,983 | (a) |
| Estimated General Unsecured Claims: | | | | | |
| WSU/FMRE | | $ 8,359 | $ 8,359 | $ 8,359 | |
| Trade | | 2,267 | 2,267 | 2,267 | |
| Lease rejection/other | | 8,306 | 8,306 | 8,306 | Based on Chapter 11 lease rejections |
| Incremental lease rejection claims from conversion to Chp. 7 | | 200 | 163 | 125 | Incremental lease rejection claims from conversion to Chapter 7. |
| Medical malpractice | | - | - | - | Assume all proceeds go to claimants and there is no excess of claims over ins. proceeds. |
| Subtotal - estimated general unsecured claims [4] | | $ 19,133 | $ 19,095 | $ 19,058 | (b) |
| **Percentage recovery to general unsecured claims (a)/(b)** | | **3%** | **46%** | **89%** | |

FOOTNOTES:
[1] Balance sheet value was $11,548.3K at 12-31-18. This balance was reduced by $2,265K to reflect collection of past due A/R from WSU during January 2019.
[2] Balance sheet value was $3,691K at 12-31-18. This balance was reduced by $1,529K to reflect payment of past due post-petition A/P (reimb. of physician comp.) to WSU during January 2019.
[3] Balance sheet value was $11,057.8K at 12-31-18. This balance was reduced by $1,563.3K to account for patient receivable credit balances shown on balance sheet as a liability.
[4] Claims bar date is approximately March 11; estimation of amount of total GUC is subject to change based on actual filed claims and Debtor's evaluation of same.

ASSUMPTIONS:
1. Liquidation analysis is prepared as of 7-26-19, the assumed Effective Date for POR.
2. A/R balances as of 12-31-18 are being used as proxy for A/R balances as of 7-26-19. However, nature of A/R will be markedly different as of 7-26-19 due to operation of contract
   between DMC and UPG. Because, under the new contract, UPG will invoice DMC for all clinical and medical administration services performed at DMC, it is estimated that approximately 50% of UPG's non-contractual A/R
   (i.e., from teaching revenue) will be owing from DMC. As of 12-31-18, none of the patient or PEPPAP related A/R was owing from DMC.
3. The terms of the Clinical and Administrative Services Agreement between DMC and UPG contain various termination provisions which have the potential to materially impact the collectability of
   the A/R that will be owing by DMC on the Effective Date. Among other things, these provisions contain a 60 days' advance written notice of cessation of operations. It is highly likely that a
   conversion to Chapter 7 would result in a cessation of UPG's operations without adequate notice, thereby giving rise to the potential for incurrence of significant damages to DMC, which could be
   contractually set off against the amounts DMC owes UPG as of the Effective Date. On the other hand, unlikely, it might be possible for a Chapter 7 trustee to reach extraordinary
   accommodations with DMC that provide for the some limited continuity of operations in exchange for satisfaction of a significant portion of the outstanding A/R. As a result of these potential
   outcomes being binary, we have assumed a recovery rate on A/R of 10% in the low case and 90% in the high case.
4. It has been assumed that medical malpractice claims are covered by existing medical malpractice insurance and that no claim exceeds the existing policy limits (UPG has been so advised by its carrier).
5. Post-petition A/P as of 12-31-18 is assumed to be a proxy for the post-petition A/P balance as of 7-26-19. Included in this balance is approximately 1 pay period (15 days) of salary reimb. obligation to WSU.
6. Liquidation analysis does not take into account other potential claims against the estate resulting from conversion to Chapter 7 including, but not limited to, WARN Act claims and breach of contract claims resulting
   (in excess of amounts that may be subject to offset against UPG's A/R) from failure to fulfill teaching and other contractual service obligations.
7. To the extent it is assumed that a Chapter 7 trustee continues to operate UPG for a temporary period following conversion, the revenues and costs of operating have not been considered in the above analysis;
   however, it is reasonable to assume that such operation would be at a loss and that such loss would impair the estimated results reflected above.